NOT RECOMMENDED FOR PUBLICATION
File Name: 05a0101n.06
Filed: February 10, 2005

No. 03-6124

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

        v.

CHARLES F. WATTS,

    Defendant-Appellant.

On Appeal from the United
States District Court for the
Western District of Kentucky

_____/

**Before:**     **GUY and COLE, Circuit Judges; TARNOW, District Judge.**[*]

    **PER CURIAM**.     Defendant, Charles F. Watts, appeals from his conviction and sentence on four counts of misapplication of funds by a bank officer, 18 U.S.C. § 656, and one count of making false entries in bank records, 18 U.S.C. § 1005, arising out of the making of a series of "nominee" loans while he was employed as a bank officer. (Counts 1, 2, 3, 5, and 6). Count 4 was dismissed by the government before trial. In the only challenge to his convictions, defendant argues it was an abuse of discretion to deny his motion for new trial based on an alleged *Brady* violation. *Brady v. Maryland*, 373 U.S. 83 (1963). After the appeal was filed, defendant argued in a supplemental brief that the calculation of his sentence under the U.S. Sentencing Guidelines (USSG) violated his rights under *Blakely v.*

_____

[*]The Honorable Arthur J. Tarnow, United States District Judge for the Eastern District of Michigan, sitting by designation.

*Washington*, 124 S. Ct. 2531 (2004). After review of the record, we **AFFIRM** the defendant's convictions and **REMAND** for reconsideration of the sentence in light of *United States v. Booker*, 125 S. Ct. 738 (2005).

## I.

From November 1992 until his resignation in November 1998, Watts was employed as President and CEO of Farmers Bank in Vine Grove, Kentucky. Before that, Watts was executive vice-president and senior loan officer at the Leitchfield Deposit Bank. In all, Watts had 28 years' experience in banking. The government presented evidence that Watts arranged nominee loans while at Leitchfield Deposit Bank that were paid off with nominee loans from Farmers Bank, and that he arranged other nominee loans while at Farmers Bank. At sentencing, the district court found the amount of loss was more than $1.3 million, $890,000 of which was attributable to "relevant conduct" not charged in the indictment, and ordered that Watts pay $1,060,840.52 in restitution.

A nominee loan occurs when a loan is issued to a borrower, but a side agreement exists, unbeknownst to the bank, under which the proceeds are expended for the benefit of a third party who agrees to assume the obligations of the loan. The government alleged that Watts arranged a series of unsecured nominee loans, the proceeds of which were expended to benefit Watts or businesses in which he held an interest. By issuing the loans in the name of another, the government alleged, Watts circumvented the borrowing limits for himself and his long-time friend and business partner, Steve Welch, as well as the disclosure and approval requirements for loans to bank officers. Over time, Watts and Welch, along with their spouses, personally guaranteed more than $900,000 in business loans from four banks.

As of 1998, $750,000 was still owed on those loans.

Watts and Welch owned two businesses of interest to this case: (1) W&W Rentals, a real estate development company they started in May 1983; and (2) WeWa, Inc., which operated Westport Food Mart and was formed in January 1992. In December 1992, while employed as senior loan officer at Leitchfield Deposit Bank, Watts asked Charles Lynch, a long-time acquaintance and customer, to borrow $150,000 in his own name and allow the proceeds to be used in a business owned by Watts and Welch. Lynch testified that Watts assured him that he would not have to make the payments. Lynch agreed and executed the documents that falsely stated the purpose of the loan. Lynch received none of the proceeds, which were deposited by Watts into the accounts of Westport Food Mart ($141,000) and W&W Rentals ($9,000). Then, on June 1, 1992, Watts arranged another nominee loan in Lynch's name without Lynch's knowledge or authorization for $28,500. The proceeds of that loan were divided between a $4,000 cash payout and a $24,500 cashier's check that was made payable to WeWa and deposited in the account of W&W Rentals. These Leitchfield nominee loans were paid off by two new nominee loans that Watts arranged shortly after he became president and CEO at Farmers Bank in November 1992.

Specifically, in December 1992, Watts arranged for a loan to be issued by Farmers Bank in Lynch's name in the amount of $29,000. It was issued without Lynch's knowledge and the proceeds were used to pay off the balance on the $28,500 loan from the Leitchfield Deposit Bank. In March 1993, the Leitchfield Deposit Bank contacted Lynch and asked him to repay the unsecured $150,000 loan. Lynch went to Watts, who arranged a nominee loan in Lynch's name from Farmers Bank to satisfy the loan at the Leitchfield Deposit Bank. As

before, defendant assured Lynch that he would not have to make the payments on this loan. These two loans from Farmers Bank in Lynch's name are the basis for the charges in Counts 2 and 3. After defendant left Farmers Bank, those loans were written off as a loss.

In December 1992, Watts and Welch approached Albert Tyler, an acquaintance who rented his home from W&W Rentals, and asked him to take out a loan for $87,000 from Farmers Bank. Tyler testified that they promised he would not have to make the payments on that loan. Tyler agreed and Watts arranged for Farmers Bank to make the loan to Tyler, falsely stating the purpose of the loan. Watts deposited the proceeds of this loan into the accounts of Westport Food Mart and W&W Rentals. This loan was the basis for the charge in Count 1. This loan was ultimately written off as a loss.

The final count of misapplication of bank funds, Count 5, charged that in January 1997, defendant arranged a nominee loan to his father-in-law, James McCray (also spelled McKray) in the amount of $160,000, the proceeds of which were used to reduce substantial negative balances in the accounts of Westport Food Mart and W&W Rentals. As president of the bank, Watts decided on a daily basis which overdrafts would be paid. By December 1996, the Westport Food Mart account was overdrawn by approximately $162,000 and the W&W Rentals account was overdrawn by more than $68,000. These amounts were more than other customers were allowed. The evidence showed that the overdrafts on the Westport and W&W Rentals accounts included regular payments on loans from other banks on which both Watts and Welch were personal guarantors. In his defense, Watts claimed he did not realize the overdrafts were for payments on those loans and emphasized that the bank reviewed the overdraft reports on a quarterly basis.

The government argued that Watts became concerned that the large negative balances in these accounts would draw the attention of the FDIC bank examiner during the audit in January 1997. Deflecting such scrutiny, McCray testified that Watts arranged the nominee loan for $160,000 from Farmers Bank, falsely stating the purpose to be a real estate investment. Watts promised that he would make the payments on that loan and deposited $130,000 into the Westport Food Mart account and the remaining $30,000 into the W&W Rentals account. A year later, in January 1998, Ken Buford was conducting the FDIC examination of Farmers Bank and asked Watts about the $160,000 loan to McCray. Defendant concealed his relationship to McCray and the true purpose of the loan. That loan was later paid off with a similar nominee loan issued to McCray by another bank. A balance of $78,000 remained on that loan at the time of sentencing and was included in the order of restitution.

Finally, Watts was charged in Count 6 with making a false entry in bank records in connection with a $70,000 nominee loan made to Mark Seabolt, d/b/a Seabolt Fuels, in June 1998. Seabolt testified that he had supplied fuel to Westport Food Mart since 1983 and that he was owed $70,000 in overdue fuel bills as of May 1998. When Seabolt approached Watts about the overdue bills, Watts convinced him to take out a nominee loan and apply the proceeds to the debt. Watts assured Seabolt that he would pay off the loan himself, and that Seabolt would not have to make any payments. Watts drafted the loan documents that falsely stated the purpose of the loan was to purchase two tractor trailer trucks that had been purchased three years earlier. This loan was defaulted and charged off as a loss.

Watts resigned from Farmers Bank in November 1998; Welch died of a heart attack

in 1999; and Watts was indicted in February 2002. The government dismissed Count 4 and proceeded to trial on the four counts of misapplication of bank funds and one count of making a false entry in bank records. In addition to testimony from the borrowers on the nominee loans, the government presented testimony from Buford, the FDIC examiner, concerning the examination and investigation he conducted, and from several bank officers and employees, a bank fraud investigator, and an FBI agent regarding bank practices and the specific transactions.

Watts testified on his own behalf and asserted a "good faith" defense; that is, that he believed in good faith that he was acting properly in connection with these transactions. This defense challenged the government's proof that Watts acted with "intent to injure or defraud," which is an element of both misapplication of bank funds by a bank officer and making a false entry in bank records. The jury was instructed that "intent to injure or defraud" means "to act knowingly and with the intent to deceive or cheat, ordinarily for the purpose of causing a financial loss to someone else or bringing about a financial gain to the defendant or another." On December 19, 2002, after three days of testimony, the jury found Watts guilty on all charges.

In preparing for sentencing, the government advised defense counsel that it intended to show that Farmers Bank had been placed in financial distress as a result of defendant's actions. In fact, the applicable guidelines provided for an increase in the offense level to 24 if defendant's conduct "substantially jeopardized the safety and soundness of a financial institution." U.S.S.G. § 2F1.1(b)(7)(A) (1998). At sentencing there was evidence that after Watts resigned from Farmers Bank, $1.7 million in loans were written off by Farmers Bank

that put the bank in danger of a takeover by the FDIC, which was only avoided when it was acquired by another bank.

This prompted defense counsel to ask for production of FDIC examination reports for the years 1988 through 1994 in an effort to refute the claim that Watts was responsible for the bank's precarious financial condition. These reports were produced, in response to defendant's subpoena, just days before the sentencing hearing. Defendant claimed that these reports contained exculpatory and impeaching evidence that should have been produced for trial in accordance with *Brady v. Maryland*, 373 U.S. 83 (1963), and *United States v. Bagley*, 473 U.S. 667 (1985). Defendant filed a motion for new trial asserting a *Brady* violation, which was denied orally before sentencing on August 18, 2003. The record reflects that the district court assumed that the reports contained *Brady* material, but found that there was no reasonable probability that disclosure of the evidence could have affected the outcome of the trial.

In connection with the sentencing determinations, the district court received testimony from Buford and others, grouped the offenses, and found several adjustments applied to increase the offense level from the base of 6 to a total offense level of 26. The district court sentenced defendant at the bottom of the guideline range to a term of 63 months' imprisonment (within the statutory maximum for *Apprendi* purposes) and ordered restitution in the amount of $1,060,840.52. This appeal followed.

**II.**

Defendant sought a new trial based on the grounds that the newly discovered FDIC reports were evidence of a *Brady* violation. *Brady*, 373 U.S. 83. We review the district

court's denial of a motion for new trial based on newly discovered evidence under an abuse of discretion standard. *United States v. Olender*, 338 F.3d 629, 635 (6th Cir. 2003).

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The Supreme Court summarized the components of a *Brady* violation as follows: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

To show prejudice the defendant must show the evidence is material; that is, "that 'there is a reasonable probability' that the result of the trial would have been different if the suppressed [evidence] had been disclosed to the defense." *Id*. at 289. Materiality is not determined by looking at the sufficiency of the evidence but, rather, whether "'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Id.* at 290 (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)).

Defendant argues that FDIC reports obtained after trial were favorable to him because they were both exculpatory and impeaching, and that there was a reasonable probability that the result would have been different if the evidence had been disclosed before trial. The evidence, submitted under seal, consists of the FDIC's Compliance Reports from January 1988, February 1990, April 1991, and January 1992 that addressed the bank's compliance

with consumer laws and regulations. These reports, all prepared before Watts became president of the bank, were generally critical of the bank's overly conservative lending practices, its lax management oversight, and its failure to adequately assess or act to meet the credit needs of the community. They also indicated a need for the bank to expand its lending base to increase the rate of growth and earnings of the bank.

Defendant relies in particular on the following passage from the report dated February 23, 1990:

> The bank's Community Reinvestment Act (CRA) performance was found to be lacking in some areas. No formal efforts have been undertaken to ascertain the credit needs of the community or if the bank is meeting those needs. The bank is located in one of the fastest growing areas of the state but has maintained a loan to asset ratio range of 30% to 40%. Only recently has the bank advertised in order to boost its current loan volume. The institution has taken little affirmative action to become involved in community development and prefers to wait for a request to be initiated by community officials. The board is encouraged to review the bank's CRA performance and consider ways to improve its record.

Defendant also quotes the following two sentences from the January 1992 Report, which stated as follows:

> No review of lending services with regard to the community's needs is performed and senior management is hesitant to explore and offer products with special features in order to make credit more widely available.
>
> . . . .
>
> Due to growth in the local area and the amount of loans extended by the competitor branch within the three years of its existence, reflects that this bank has not been responsive to the credit needs of the community.

In fact, defendant contends that the bank finally responded to these concerns by hiring him.

Watts argues that this evidence was exculpatory because it would lend credence to his

claim that he acted in good faith when he authorized the nominee loans that were the basis for the charges in this case. Defendant seems to say that these criticisms documented a need to increase the lending activity of the bank. However, nothing in the FDIC's reports can be read to condone the defendant's actions in making the nominee loans that were the basis for the charges in this case. To the extent the evidence suggests or defendant could use it on cross-examination to establish that there was an expectation that he would be more aggressive in extending credit than the bank had been in the past, that would not demonstrate that the bank expected him to circumvent lending limits and make nominee loans that falsely stated their purpose and use the proceeds to benefit himself or businesses in which he had an interest.

Defendant also argues that the evidence was exculpatory because it provided "important contemporaneous information concerning the attitude and motives of the Board of Directors of the Bank in retaining and overseeing the actions of the Defendant," as well as "significant insight into the environment in which Mr. Watts found himself when he became employed at the Bank in 1992." Neither evidence of a history of overly conservative lending practices nor indications that the bank had inadequate oversight in compliance matters would tend to show that Watts was acting in a good faith belief that the nominee loans were proper. If anything, it suggests that the "motives" and "environment" made the bank ripe for defendant's fraudulent conduct.

At best, Watts could argue that he did not have the requisite "intent to defraud" because he was trying to help the Bank increase its lending while simultaneously helping himself. This argument is hopeless. This Court has stated that:

> An intent to injure or defraud, as contemplated by the statute, is not inconsistent with a desire for the ultimate success and welfare of the bank. It may, within the meaning of the law, result from an unlawful act voluntarily done, the natural tendency of which may have been to injure the bank. A wrongful misapplication of funds, even if made in the hope or belief that the bank's welfare would ultimately be promoted, is none the less a violation of the statute, if the necessary effect is or may be to injure or defraud the bank.

*Galbreath v. United States*, 257 F. 648, 656 (6th Cir. 1918) (cited generally by *United States v. Foster*, 566 F.2d 1045, 1050 (6th Cir. 1977), and quoted for this proposition in *Golden v. United States*, 318 F.2d 357, 361 (1st Cir. 1963)). The jury found that the effect of Watts's action was to defraud the bank: he concealed information from the Bank and falsified records in order to have his loan scheme undetected. Additionally, the Bank lost money as a result of his conduct. Moreover, "'[t]he test is whether or not the bank was defrauded of something, defrauded of its right to have custody of these funds, the right of the bank to make its own decisions as to how these funds were to be used . . . the fact that there may not have been a loss here, or may have been a profit, has nothing to do with whether or not this defendant violated the Act.'" *Golden*, 318 F.2d at 360-61 (citing related jury instructions approvingly). Here, the evidence established that Watts intended to defraud the Bank for the purpose of alleviating his own financial obligations; by concealing vital information, he deceived the Bank regarding how its funds were being used. Thus, the FDIC reports are not material to Watts's good faith argument.

Finally, defendant argues the reports could have been effective in impeaching Buford because they indicate that the bank had compliance problems and was in a weak financial condition even before he became president. Specifically, Watts argues the evidence could have been used to impeach Buford's testimony and the "implied, if not express position of

the government that the financial problems of the Bank were the fault of Mr. Watts." The charges of misapplication of bank funds and false entry in bank records did not require proof that the defendant caused any financial loss. It appears, actually, that the government did not attempt to show at trial that defendant's actions put the bank's assets at risk as the district court excluded evidence concerning other "relevant conduct" not charged in the indictment. Rather, as is suggested by defendant's emphasis on and citation to Buford's testimony at the sentencing hearing, evidence concerning the impact of defendant's conduct on the bank's financial condition was presented in connection with the calculation of the defendant's sentence under the guidelines. To the extent that the FDIC reports were relevant to impeachment on this point, they had been produced before sentencing and were used in cross-examining the government's witnesses.

After review of the record and the FDIC reports in question, we find the district court did not abuse its discretion in concluding that there was no reasonable probability that the result of the trial would have been different if those reports had been disclosed before trial. The evidence cannot be said to put the case in such a different light as to undermine confidence in the verdict.

**III.**

Defendant argues for the first time on appeal that while his sentence did not exceed the statutory maximum, the judicial fact-finding undertaken in determining his sentence in this case violated *Blakely v. Washington*, 124 S. Ct. 2531 (2004). With the recent decision in *United States v. Booker*, 124 S. Ct. 738 (2005), it is necessary that the district court reconsider defendant's sentence. *United States v. Oliver*, __ F.3d __, 2005 WL 233779 (6th

Cir. Feb. 2, 2005); *United States v. Bruce*, __ F.3d __, 2005 WL 241254 (6th Cir. Feb. 3, 2005).

Accordingly, we **AFFIRM** defendant's convictions and **REMAND** for the district court to reconsider defendant's sentence in light of *Booker*.