**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 3, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

    v.

GARY W. FLANDERS,

    Defendant - Appellant.

No. 05-6379

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. 03-CR-243-F)**

---

Sean Connelly, Reilly, Pozner & Connelly LLP, Denver, Colorado, for Defendant-Appellant.

Vicki Zemp Behenna, Assistant United States Attorney (John C. Richter, United States Attorney with her on brief), Oklahoma City, Oklahoma, for Plaintiff-Appellee.

---

Before **LUCERO**, **McKAY**, and **MURPHY** Circuit Judges.

---

**McKAY**, Circuit Judge.

---

A jury convicted Defendant Gary Flanders, former CEO and supermajority shareholder of MetroBank, of two counts of willful misapplication of bank funds,

in violation of 18 U.S.C. § 656, two counts of scheming to defraud a bank, in violation of 18 U.S.C. § 1344(1), one count of making a false entry in a bank record, in violation of 18 U.S.C. § 1005, and one count of conspiring to make a false statement to a bank, in violation of 18 U.S.C. § 1014.

Defendant was sentenced to ninety-six months' imprisonment—some eighteen months above the Sentencing Guideline recommendation—and ordered to pay $80,000 restitution, among other penalties. Defendant appeals his conviction alleging insufficiency of the evidence on five of the six counts,[1] violation of his Sixth Amendment right to chosen counsel, and commission of numerous sentencing errors.

## BACKGROUND

In providing the pertinent facts, we view the record in the light most favorable to the government. *United States v. Weidner*, 437 F.3d 1023, 1027 (10th Cir. 2006).

Defendant acquired MetroBank, a federally chartered, FDIC-insured bank operating in Oklahoma City, Oklahoma, from the FDIC in 1989 by purchasing a bank stock loan on which the original investors defaulted. In September 1997, Defendant took out two loans totaling $3,838,000 from Bridgeview Bank Group ("Bridgeview") primarily to satisfy the bank stock loan that he used to acquire

---

[1] Defendant does not appeal his conviction under § 1014.

MetroBank. As collateral for this loan, Bridgeview took Defendant's certificate for 248,000 shares of MetroBank stock and placed liens on Defendant's Colorado Springs, Colorado home, a separate 125-acre tract in Colorado Springs, and miscellaneous assets.

Defendant's first payment obligation to Bridgeview was due January 1998. It went unpaid, and payment negotiations between Defendant and Bridgeview ensued. These negotiations dragged on for months without Defendant ever tendering valid payment.[2] On October 16, 1998, not long after Bridgeview informed Defendant of its intention to accelerate the loan and ultimately foreclose, Defendant filed for Chapter 11 bankruptcy. Defendant's attempts to reorganize under Chapter 11 protection proved unsuccessful. As a result, the bankruptcy court converted Defendant's Chapter 11 bankruptcy to Chapter 7 on December 17, 1999.

In accordance with Chapter 7 procedure, the bankruptcy court appointed a trustee to liquidate Defendant's assets, including his MetroBank stock. Due to FDIC rules that require bank officers and directors to own stock in the banks they serve, Defendant faced removal. At a special shareholders' meeting on January 19, 1999, Defendant resigned his position, and the MetroBank board of directors ratified his resignation.

---

[2] In August 1998, Defendant bounced several loan payment checks drawn on an account at Rocky Mountain Bank.

Defendant's six-count conviction arose out of four transactions—an automobile loan, two independent real estate loans, and the attempted sale of the MetroBank building—conducted during Defendant's bankruptcy. Defendant initiated these transactions in an apparent attempt to generate funds with which to satisfy his substantial outstanding debts. As the supermajority shareholder, Defendant received dividends from MetroBank profits. Defendant typically took upward of ninety percent of the profits in dividends. These dividends were Defendant's sole source of income.

### A.    The Fischer Automobile Loan

#### 1.    Automobile Ownership

In January 1998, the Office of the Comptroller of the Currency ("OCC"), a division of the United States Treasury Department tasked with supervising the operations of federally chartered banks, learned that Defendant had been driving a 1995 Mitsubishi Eclipse owned by MetroBank. MetroBank acquired the Mitsubishi following its repossession due to an unrelated, unpaid loan. The OCC criticized Defendant's personal use of the vehicle without reimbursing MetroBank for expenses associated with its use. It demanded that Defendant either reimburse the bank or purchase the vehicle outright.

Defendant selected the latter option. In late January 1998, he purchased the vehicle from MetroBank on credit by executing a $9,000 note in favor of

MetroBank with MetroBank taking a lien against the vehicle. Defendant thereafter timely made the monthly loan installment payments. In early January 1999, however, Defendant approached Nancy Bainbridge, MetroBank's chief financial officer, about reversing the loan and returning the vehicle to MetroBank's possession. Ms. Bainbridge informed Defendant that the loan reversal was not possible.

At that point, Defendant informed Ms. Bainbridge that he had failed to title the vehicle in his name. The existing title certificate listed MetroBank as the owner on the front side, but the back side bore a notarized acknowledgment of the transfer of ownership to Defendant. Defendant requested that Ms. Bainbridge obtain a duplicate title, which would not bear notarized evidence of the previous transfer. Defendant claimed that with the duplicate title he could properly title the vehicle without having to pay a penalty for not having titled the vehicle within the time allotted by the Oklahoma department of motor vehicles. Ms. Bainbridge refused Defendant's request.

Nevertheless, a title was issued on January 12, 1999, listing MetroBank as the owner of the vehicle. Despite the title confusion, an OCC examiner testified that the car in fact belonged to Defendant.

### 2. Automobile Loan

In March 1999, Defendant sold the Mitsubishi for $10,000 to Michelle

Fischer, an acquaintance of co-defendant David Solomon.[3] Defendant required that Ms. Fischer make a $1,000 down payment. Ms. Fischer obtained the remaining $9,000 from a MetroBank loan issued on March 19, 1999. MetroBank took a lien against the vehicle, which had a Kelley Blue Book value of between $9,000 and $10,000. Mr. Solomon acted as a guarantor.

According to Cody Machala, a junior loan officer at MetroBank, Defendant asked him to examine Ms. Fischer's loan application. Mr. Machala's examination revealed that both Ms. Fischer and Mr. Solomon had poor credit. As a result, Mr. Machala "did not feel comfortable making this loan." (App. at 671.) Mr. Machala, however, did not explain his concerns to Defendant because he felt "a little intimidated" by Defendant and because he believed Defendant wanted him to make the loan. (App. at 672.) Instead, Mr. Machala sought the advice of two more senior MetroBank loan officers. Those loan officers both stated that because the amount of the loan was within Defendant's lending authority, Mr. Machala should make the loan. At least one of the loan officers cautioned Mr. Machala, however, to put Defendant's initials on the paperwork to signify that

---

[3] The original indictment, filed on November 19, 2003, also charged co-defendant David Solomon in four of the six bank fraud charges. On April 23, 2004, however, Mr. Solomon was deemed incompetent to stand trial. This resulted in a superseding indictment filed some ten months later, on February 16, 2005. That indictment continued to list Mr. Solomon as a co-defendant, but the counts were amended to charge only Defendant with the underlying offenses rather than conspiracy.

Defendant was in fact the loan officer of record.

Defendant informed Mr. Machala to distribute the loan proceeds to two of Defendant's outstanding loans with MetroBank. Mr. Machala applied $6,476.85 to Defendant's car loan, completely paying off that debt. He applied the remaining proceeds plus the $1,000 down payment to another of Defendant's loans. This distribution was recorded on several official bank forms as well as a nonstandard memorandum created by Mr. Machala for the express purpose of detailing the loan proceed distribution "due to where the proceeds were going." (App. at 676.)

Ms. Fischer timely tendered the first three monthly loan installment payments before defaulting. Mr. Solomon then paid approximately four months' worth of delinquent payments before also defaulting. Ultimately, MetroBank repossessed the Mitsubishi and sold it at auction for $7,130.

### B. The Nelco Real Estate Loan

#### 1. The Transaction

In early 1999, Defendant approached Ms. Bainbridge seeking advice regarding the possible purchase by MetroBank of a 160-acre tract in Newcastle, Oklahoma. Defendant explained to Ms. Bainbridge that the property represented a lucrative development opportunity given the State's intended installation of a nearby turnpike. Ms. Bainbridge informed Defendant that banks were prohibited

from buying and holding land for purposes of speculation.

Around this time, Mr. Solomon introduced Defendant to unindicted co-conspirator Nels Bentson, an entrepreneur who owned a chain of small-loan and check-cashing service stores for which Mr. Solomon occasionally performed work. Defendant, Mr. Solomon, and Mr. Bentson agreed to purchase the 160-acre parcel and turn it into a housing development known as Eden Estates. Mr. Bentson was in charge of developing Eden Estates, Mr. Solomon of marketing and selling the developed lots, and Defendant of financing the project.

At Defendant's suggestion, Mr. Bentson formed Nelco, Inc. ("Nelco"). Nelco would obtain a $500,000 loan from MetroBank in order to purchase and develop the property. Of the loan proceeds, $352,000 was earmarked to purchase the land with the remaining funds available to draw upon as Nelco incurred development costs. At some point, Mr. Solomon was injected as an intermediate buyer. The transaction then was arranged as a double-escrow closing such that Mr. Solomon would purchase the land for $352,000 and immediately transfer it to Nelco at a cost of $1.2 million, a figure apparently representing a portion of the property's post-development value. In return, Nelco would issue a $910,000 promissory note to Mr. Solomon, who in turn would sell it to MetroBank for a mere $10,000.

The proposed loan transaction was presented to the MetroBank board of

directors for approval on April 6, 1999.[4]  Despite concerns over the valuation attached to the land as well as to the promissory note, the board approved the loan subject to removing Mr. Solomon from the transaction.  This conditional approval was prompted due to Mr. Solomon's poor credit and the presence of tax liens against Mr. Solomon that could effect the chain of title.  According to notes taken by Ms. Bainbridge at that meeting, the board refused to "deal with David Solomon due to his credit report" and required "[g]ood and clear title."  (App. at 820-21.)

Following this meeting, on April 15, 1999, Mr. Solomon incorporated TransTech Properties, Inc. ("TransTech") at Defendant's suggestion.  TransTech was then substituted as the intermediary purchaser.  Although a MetroBank employee prepared a credit memorandum detailing Mr. Solomon's ownership of TransTech, it is not clear that this memorandum was made available to the board until April 22, 1999, the day after the Nelco transaction closed.  It is clear that board members expressed dissatisfaction over Mr. Solomon's continued involvement in the transaction when the issue came up at the May 13, 1999 board

---

[4] Defendant previously presented a differently structured loan transaction to the MetroBank loan committee on March 4, 1999.  The terms of that transaction called for a $514,000 loan, with $170,000 going to purchase the land, $200,000 returning to MetroBank as a finder's fee, and the remaining funds financing the development.  The loan committee expressed doubts over the land valuation and voiced concerns over the legality of collecting a finder's fee.  That meeting adjourned without voting on the transaction.

meeting.

### 2. The Bank Records

Yet, one month later, at a June 23, 1999 board meeting, the board approved a version of the April 6, 1999 meeting minutes that omitted any mention of the conditions imposed. Chris Rauchs, an outside contractor, had produced written draft minutes of the April 6 meeting based on a tape recording made of that meeting. Ms. Rauch's initial draft listed the conditions imposed on the Nelco loan approval. Defendant then called Ms. Rauchs to request that she delete that portion of the minutes and she complied with that request.

MetroBank loan officer Virginia Evans alerted the OCC of the discrepancy in the various draft minutes during a standard OCC review conducted on or around June 14, 1999. She did not report the discrepancy to the board of directors prior to or during the June 23, 1999 board meeting at which the altered minutes were approved.

### C. The Reisig Real Estate Loan

Nelco's Eden Estate development was located in close proximity to other housing developments, including Meadowview Estates and Oak Forest, which were both developed by M.C. Land, a property development company co-owned by Mike Campbell and Ross Morris. Mr. Campbell was acquainted with Defendant because MetroBank had provided the financing for Meadowview's

development.  Mr. Campbell also was acquainted with Mr. Solomon, whom he described as Defendant's "envoy."  (App. at 1270.)

In Fall 1999, Mr. Solomon approached Mr. Campbell regarding M.C. Land's desire to sell seven, undeveloped, one-acre lots in the Oak Forest development.  Mr. Solomon stated that he had located a potential buyer who was interested in starting a property development business.  Mr. Campbell indicated that he would sell all seven lots for $10,000 per lot, or $70,000.

Around the same time, Mr. Solomon approached an acquaintance, Jon Reisig, about purchasing these lots.  Mr. Solomon introduced Mr. Reisig to Defendant, who told Mr. Reisig about the potentially lucrative opportunity presented by the Oak Forest lots.  Defendant also told Mr. Reisig that MetroBank would provide any necessary financing.  Without seeking an appraisal or conducting a survey or even seeing each lot, Mr. Reisig agreed to purchase all seven lots for $11,500 per lot, or $80,500.

Mr. Campbell and Mr. Reisig never negotiated with one another, so neither was aware of the price disparity.  Indeed, Mr. Reisig was under the impression that $11,500 per lot amounted to $90,000, the final sale price as set by Mr. Solomon and Defendant.  The entire transaction was based on oral promises; the parties never entered into a written contract.

Defendant asked John DeFrees, MetroBank's senior lending officer, to prepare and present the loan to the loan committee for approval.  Defendant was

unable to do so himself because the OCC had suspended Defendant's lending authority following his issuance of a number of questionable loans. Mr. DeFrees passed the loan off to Bob Osborne, a lending officer with more real estate loan experience. Under the terms of loan, MetroBank would loan $248,000 to Reisig Enterprises, a corporation wholly owned by Jon Reisig. The total loan amount was based on $90,000 for the purchase of the seven lots, $82,000 for the purchase of a modular show home, and $76,000 for a revolving line of credit for costs associated with building homes on any sold lots. The loan committee initially rejected the loan. Defendant, Mr. DeFrees, and Mr. Osborne then reworked the proposal to address the committee's concerns. On December 9, 1999, the loan was again presented to the loan committee, and approval was granted.

Just before the closing, Defendant informed Mr. DeFrees that $40,000 of the $90,000 purchase price was to be distributed to TransTech as a finder's fee. Mr. DeFrees informed Mr. Osborne, who had the closing documents changed to reflect this disbursement. In order to effectuate this disbursement, Defendant had TransTech inserted as an intermediary buyer/seller of the lots. Despite these changes, the loan was not presented to the loan committee for reapproval.

Mr. Campbell also was notified of a last minute change. The day before the closing, Mr. Campbell received a telephone call from Defendant informing him that Mr. Reisig's wife had "thrown a fit" over the sale price. (App. at 1275, 1276.) According to Defendant, Mr. Reisig was now willing to pay only $7,000

per lot, or $49,000. Mr. Campbell reluctantly agreed to the new price. Mr. Reisig and his wife testified that Defendant's representations were false.

On December 22, 1999, the parties met at MetroBank for the closing. At that time Mr. Campbell became aware of TransTech's involvement. Having received his payment, however, he signed the appropriate documents and left. Mr. Reisig apparently remained unaware of TransTech's involvement and its receipt of $40,000. Mr. Reisig never read the closing documents or retained counsel to assist in reviewing the deal.

Immediately after the closing, Mr. Solomon gave roughly $19,000 to MetroBank to purchase six, nonperforming, uncollectible loans, otherwise known as charged-off loans.[5] In addition, approximately $1,600 went to make delinquent payments on the Fischer car loan. Mr. Solomon also attempted to give $10,000 to Mr. Reisig as repayment for a failed investment Mr. Reisig had made at Mr. Solomon's urging.

### D. The Attempted Building Sale

As noted above, Defendant's Chapter 11 bankruptcy was converted to Chapter 7 on December 17, 1999. Pursuant to the bankruptcy code, the Chapter 7 trustee at that point became the statutory owner of all Defendant's assets,

---

[5] These loans had a total principal value of around $25,000. Mr. DeFrees testified that charged-off loans typically sell for around ten percent of their principal value. Mr. Solomon paid more than seventy-five percent.

including his MetroBank stock. The trustee informed Defendant on January 4, 2000, that a special board meeting would be held on January 19. That meeting was scheduled in order to discuss Defendant's inability to continue to serve on the MetroBank board due to his lack of stock ownership.

On January 11, 2000, Defendant contacted real estate attorney Kiran Phansalkar to assist in the sale of MetroBank building. Defendant represented that he had authority to sell the bank building and that the sale was aimed at achieving tax breaks. Although the board had granted Defendant authority to explore the sale of bank assets nearly one month earlier, that authority was conditioned on obtaining regulatory approval from the OCC prior to effectuating any sale. At a meeting at Mr. Phansalkar's office on January 17, 2000, Defendant informed Mr. Phansalkar that Oklahoma Central Railroad ("OCRR"), a company wholly owned by Defendant's wife, would be the purchaser. Mr. Phansalkar expressed concerns about the inside nature of the transaction, but was reassured by Defendant about his authority to conduct the sale. Mr. Phansalkar later learned that OCRR's corporate status had been suspended, meaning it was not legally able to conduct business operations.

According to the terms of the transaction, OCRR would buy the building on credit for $2 million, but would only make a $10,000 down payment. OCRR would then lease the building back to MetroBank at a monthly rent of $20,000 for a period of twenty-five years. According to Defendant's wife, OCRR did not

-14-

have the funds to effectuate the sale.  Defendant attempted to arrange the financing through Old Standard Life Insurance ("Old Standard").  Defendant had his wife sign a check to Old Standard for $10,000 in exchange for a commitment letter regarding a $2 million loan.  That commitment never came.  Nevertheless, Defendant and his wife signed all the necessary sale documents on January 18, 2000, the night before the special shareholder's meeting.  At Defendant's urging, Mr. Phansalkar placed the documents in escrow subject to closing.

Unbeknownst to Mr. Phansalkar, the next day the MetroBank board of directors removed Defendant from the board and relieved him of his role at the bank.  At no point in that meeting did Defendant advise the board of the impending sale.  Two days later, the incoming MetroBank president learned of the attempted sale.  He immediately contacted Mr. Phansalkar and stopped the transaction.

## ANALYSIS

### I.    Sufficiency of the Evidence

We review sufficiency of the evidence challenges *de novo* to determine whether, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt.  *United States v. Yehling*, 456 F.3d 1236, 1240 (10th Cir. 2006).  We consider both direct and circumstantial evidence, together with the reasonable

-15-

inferences to be drawn therefrom. *Id.* We do not, however, weigh conflicting evidence or consider witness credibility. *Id.*

We also generally review *de novo* a district court's denial of a motion for judgment of acquittal. *United States v. Apperson*, 441 F.3d 1162, 1209 (10th Cir. 2006). This circuit, however, follows the waiver rule. Under that rule, "'a defendant who moved for a judgment of acquittal at the close of the government's case must move again for a judgment of acquittal at the close of the entire case if he thereafter introduces evidence in his defense.'" *United States v. Bowie*, 892 F.2d 1494, 1496 (10th Cir. 1990) (quoting *United States v. Lopez*, 576 F.2d 840, 842 (10th Cir. 1978). Because Defendant failed to reaffirm his motion for judgment of acquittal after testifying in his own defense, we review for plain error under Fed. R. Crim. P. 52(b). *Id.* The analysis, however, is "essentially the same" as under sufficiency of the evidence. *Id.*

## A.   § 656

A conviction for willful misapplication of bank funds under 18 U.S.C. § 656 requires the government to prove that (1) the defendant was a bank officer or director (2) of a national or federally insured bank (3) from which the defendant willfully misapplied funds and (4) that the defendant acted with intent to injure or defraud the bank. *United States v. Rackley*, 986 F.2d 1357, 1361 (10th Cir. 1993). Although "intent to injure or defraud" is not an explicit statutory element

-16-

of § 656, the Courts of Appeals all agree that "intent to injure or defraud" must be established. *See Bates v. United States*, 522 U.S. 23, 30 n.4 (collecting cases). This court has stated that evidence of an "intent to deceive" may be sufficient, in certain circumstances, to supply the necessary proof of criminal intent required under § 656. *United States v. Harenberg*, 732 F.2d 1507, 1511-12 (10th Cir. 1984) (relying upon implicit holding of *United States v. Twiford*, 600 F.2d 1339, 1341 (10th Cir. 1979)).

Defendant asserts that his conviction "extends the misapplication statute in an unprecedented fashion" (Appellant's Br. at 22) because there was insufficient evidence of his intent to conceal the use of the funds at issue.

### 1.    The Fischer Automobile Loan

According to Defendant, the fact that he truthfully and openly disclosed the Fischer loan proceeds in the loan documents renders misapplication impossible as a matter of law. The use of the Fischer loan proceeds to pay off Defendant's own car loan as well as other MetroBank debts was stated on the face of the loan documents. In addition, Mr. Machala created a separate, nonstandard memorandum detailing the disbursements. This made Defendant's personal benefit readily apparent to anyone reviewing the loan file.

The government points out that "to be convicted under § 656, a defendant need not have made a false statement or representation." *United States v.*

*Haddock*, 961 F.2d 933, 935 (10th Cir. 1992). Rather, under the government's theory, Defendant intended to defraud MetroBank simply by granting a loan to an uncreditworthy borrower. The indictment charged Defendant with "caus[ing] a car loan to be made to a borrower, who could not otherwise qualify for the loan, and then us[ing] the proceeds for his own personal benefit." (App. at 61, Count 1, ¶ 3.) The prosecutor's synopsis of misapplication in her closing argument bears striking similarity: "Misapplication occurs . . . when . . . a loan officer . . . provides a loan to an individual who is not creditworthy for his own personal benefit." (App. at 1961.) Thus, the question before the court is whether a defendant who grants a loan to an uncreditworthy borrower possesses the necessary criminal intent to be guilty of willful misapplication where the bank is fully aware of the borrower's poor credit history and where the defendant's personal benefit is fully disclosed.

The term "willful misapplication" has "no settled technical meaning," but "was intended to include acts not covered by the words 'embezzle' or 'abstract' as such are used in the statute." *United States v. King*, 484 F.2d 924, 926 (10th Cir. 1973). However, "'misapplication has been distinguished from 'maladministration.'" *Id.*; *see also United States v. Blasini-Lluberas*, 169 F.3d 57, 63 (1st Cir. 1999) (noting that uncertain definition of willful misapplication has "posed a challenge to courts attempting to distinguish bad judgment from bad conduct that is illegal"). In *United States v. Davis*, this court illustrated two

examples of misapplication in relation to 18 U.S.C. § 657, a parallel statute

governing misapplication at federal savings and loan institutions:

> Misapplication may occur when an officer, director, employee or
> other person subject to the statute knowingly lends money to a sham
> borrower or causes all or part of the loan to be made for his own
> benefit while concealing his interest from the bank. Misapplication
> of funds "occurs when funds are distributed under a record which
> misrepresents the true state of the record with the intent that bank
> officials, bank examiners, or the [FDIC] will be deceived." Thus,
> when a person within the ambit of § 657 receives material benefits
> of loans without disclosing this fact, misapplication has occurred.

953 F.2d 1482, 1493 (10th Cir. 1992) (quotations and citations omitted). Under

both examples, concealment of a personal stake is crucial. Similarly, in *Rackley*,

986 F.2d at 1361, we held that a bank could be defrauded under § 656 even when

some bank employees knew about the nature of the transactions *if* the defendant

failed to "disclos[e his] interest on the loan documents, thereby flouting banking

rules and regulations designed to protect the financial integrity of the bank."

Defendant argues that while § 656 does not require a false statement or

representation, it does require at least some attempt at concealment. Absent that,

Defendant argues that his fully disclosed involvement in a loan to an

uncreditworthy individual cannot satisfy the intent to injure or defraud element.

Indeed, the jury was instructed that "intent to defraud" requires "the specific

intent to deceive or cheat" (App. at 120), and the government does not argue that

this instruction was erroneous. Even the case on which the government relies,

*United States v. Unruh*, 855 F.2d 1363, 1375 (9th Cir. 1987), indicates that more

is required than just showing that the defendant made a loan to an uncreditworthy individual: "The creditworthiness of the borrowers is relevant because a bank officer who, *with intent to defraud or injure*, makes loans to 'financially incapable' individuals is guilty of misapplication of bank funds." *Id.* (emphasis added); *see also id*. at 1371 (noting that difference between upheld and overturned § 656 convictions was lack of bank record falsification in overturned conviction).

We agree with our sister circuits that the intent to injure and the intent to defraud are distinct options under § 656 violations.[6] *See United States v. Lung Fong Chen*, 393 F.3d 139, 145-46 (2d Cir. 2004) ("Section 656's intent requirement is properly read in the disjunctive and thus proof of intent to injure *or* defraud is sufficient to support a conviction."); *Valansi v. Ashcroft*, 278 F.3d 203, 210 (3d Cir. 2002) (stating that intent "may be shown either by intent to injure or intent to defraud"); *United States v. Castro*, 887 F.2d 988, 995 (9th Cir. 1989) ("Intent to injure need not be shown if there is intent to deceive or

_____

[6] We note that many opinions conflate the recitation of the law. *See*, *e.g.*, *Golden v. United States*, 318 F.2d 357, 360-61 (1st Cir. 1963) (upholding jury instruction and noting that instruction stated proper test for intent to injure or defraud as "whether or not the bank was defrauded of something, defrauded of its right to have custody of [its] funds, the right of the bank to make its own decisions as to how these funds were to be used, and to act under other regulations promulgated in protection of banking"). Nevertheless, the majority of opinions conduct the factual application of intent to injure and intent to defraud separately. *See*, *e.g.*, *United States v. Evans*, 42 F.3d 586, 590 (10th Cir. 1994).

defraud."); *United States v. Angelos*, 763 F.2d 859, 861 (7th Cir. 1985) ("[I]t is important to distinguish between intent to injure and intent to defraud; either will do, and they are not the same."). Proving that a defendant acted with the intent to defraud requires evidence of an intent to deceive, such as "misrepresent[ing] the purpose of the loan," *Blasini-Lluberas*, 169 F.3d at 64, or "concealing vital information," *United States v. Watts*, 122 Fed. App'x 233, 239 (6th Cir. 2005). *See*, *e.g.*, *United States v. Giraldi*, 86 F.3d 1368, 1377 (5th Cir. 1996) (approving jury instruction stating that "intent to defraud means to act with an intent to deceive or cheat someone, ordinarily for the purpose of causing some finance [sic] loss to another or bringing about some financial gain to oneself" (alteration in original)). To prove an intent to injure, the prosecutor must show that the defendant knowingly committed a voluntary act, the "natural tendency of which would be to injure the bank," regardless of whether the defendant had a "subjective intent" to harm the bank. *United States v. Bruun*, 809 F.2d 397, 408 (7th Cir. 1987) (collecting cases); *cf. Evans*, 42 F.3d at 590 (using phrases "natural tendency . . . could not have been to injure" and "tended to injure" without clearly distinguishing intent to injure from intent to defraud).

The government has failed to establish that Defendant acted with an intent to defraud MetroBank. The loan file contained all the appropriate documentation, as well as additional information specifically detailing Defendant's benefit. Defendant made no attempt to conceal the loan, the borrower's poor credit, or the

disbursement of loan proceeds. Although Defendant exercised control over the bank employees and encouraged them to issue a questionable loan, the government presented no evidence that Defendant tampered in any way with the loan or misled the bank or its employees. *Cf. Haddock*, 961 F.2d at 935 (finding misapplication where bank president defendant's "substantial control" over bank employees and "over much of what occurred at the bank" prevented his massively overdrawn check from bouncing for nearly two weeks). Rather, Defendant handed the loan to Mr. Machala for review despite himself possessing the authority to issue the loan without loan committee or board approval, thus making the transaction that much more transparent.

The government cites to Defendant's inappropriate personal use of the vehicle, his request to reverse his own car loan, his application for duplicate title, and his early lien release as evidence of misapplication. Some or all of these actions may constitute misapplication in and of themselves, but these actions did not form the basis of the misapplication charge for which Defendant was convicted. And while these facts certainly indicate Defendant's desire to be free from his loan obligation, they do not show that he had any intent to defraud MetroBank by issuing the Fischer loan. *See United States v. Valadez-Gallegos*, 162 F.3d 1256, 1262 (10th Cir.1998) ("[W]e may not uphold a conviction obtained by piling inference upon inference.").

Nor did the government produce any evidence of Defendant's intent to

injure MetroBank. Whatever Defendant's motivation, we cannot say that the Fischer loan posed an "indefensible risk" to MetroBank. *King*, 484 F.2d at 927 (quotation omitted). Ms. Fischer was cognizant of her loan obligation, and the testimony establishes that the loan was adequately collateralized. We recognize that certain cases within this circuit have hinted that a borrower's adverse credit history may influence a misapplication determination. *See*, *e.g.*, *Evans*, 42 F.3d at 590. However, the parties have not alerted us to any case holding that the borrower's inadequate credit is sufficient in and of itself to sustain a conviction, nor have we located any such case. Accordingly, we will not extend the reach of § 656 by reading it so broadly that we criminalize the making of a loan to an uncreditworthy individual even where a personal benefit is derived absent further circumstances.

### 2. The Reisig Real Estate Loan

Whether Defendant possessed the intent to injure or defraud MetroBank is also central to Defendant's conviction for misapplication on the Reisig loan. As before, the nature of the loan makes analysis of the misapplication statute difficult. The government argues that Defendant "used his position to push through a loan" (Appellee's Br. at 19) and that the entire transaction was "rife with deception" (*id.* at 23). We agree that deception played a major role in this transaction. The evidence at trial, however, predominately focused on

Defendant's alleged fraud against Mr. Campbell and Mr. Reisig in relation to the sale and purchase price disparity. The government's attempt to establish misapplication by bootstrapping from that fraud leaves a limited record of proof supporting Defendant's intent to injure or defraud MetroBank.

Yet, that record is sufficient to uphold Defendant's conviction on this count. From the inception of this deal, Defendant caused MetroBank to issue a loan in excess of the sale value by inflating the sale price. That disparity was heightened by Defendant's surreptitious, last-minute rejiggering of the sale price. Mr. Campbell, Mr. Reisig, and, most importantly, MetroBank, were unwitting dupes.

True, the $40,000 benefit to TransTech was fully disclosed in the loan documents. However, the testimony established that the MetroBank board previously had refused to deal with Mr. Solomon and, by implication, TransTech. As a result, Defendant's last-minute insertion of TransTech could have led the jury to infer that Defendant was generating income for himself and Mr. Solomon at the bank's expense in a manner designed to keep the loan committee and the board in the dark.

Indeed, Defendant inserted TransTech as an intermediary buyer/seller in order to have a vehicle through which to withdraw those funds. Defendant skimmed the money off the loan transaction in order to funnel it to Mr. Solomon and himself. Defendant had Mr. Solomon use $21,000 to purchase charged-off

loans and pay off overdue loan balances in an effort to make it appear as if MetroBank had generated income from which Defendant could take dividends. The remainder of the money flowed directly out of the bank: $10,000 went back to Mr. Reisig to cover a debt Mr. Solomon incurred, roughly $1,000 went to unindicted co-conspirator Bentson, and some $6,000 went into Mr. Solomon's pocket.

Defendant's actions in pushing through a fraudulent loan posed an "indefensible risk" of default to MetroBank. *King*, 484 F.2d at 927 (quotation omitted). Collateralization and creditworthiness aside, by lying about the sale price to all parties involved in order to carve out funds for his personal use, Defendant caused MetroBank to pay out $40,000 that, upon discovery of the ruse, would likely never be paid back. We are convinced, therefore, that the scheme was not only done with the intent to defraud MetroBank, but also that it was likely to cause injury to the bank.

### B.    § 1344(1)

Under 18 U.S.C. § 1344(1), the government must prove that: (1) the defendant knowingly executed or attempted to execute a scheme or artifice to defraud a financial institution; (2) the defendant had the intent to defraud a financial institution; and (3) the bank involved was federally insured. *United States v. Waldroop*, 431 F.3d 736, 741 (10th Cir. 2005). Consistent with the

common law definition of "fraud," § 1344(1) requires "a misrepresentation or concealment of *material* fact." *Neder v. United States*, 527 U.S. 1, 22 (1999).

"Section 1344 was intended to reach a wide range of fraudulent activity that undermines the integrity of the federal banking system." *Rackley*, 986 F.2d at 1361. Accordingly, "courts have liberally construed the statute." *United States v. Bernards*, 166 F.3d 348 (10th Cir. 1998) (table) ("'The broad range of schemes covered by the statute is limited only by a criminal's creativity.'" (quoting *United States v. Norton*, 108 F.3d 133, 135 (7th Cir. 1997))).

### 1.    The Nelco Real Estate Loan

Defendant argues that the Nelco loan was "an economically sound loan that benefitted the bank and brought Defendant no personal gain." (Appellant's Br. at 34.) Consistent with the courts' broad reading of the statute, as outlined above, as well as the statute's express purpose of punishing the scheme to defraud and not the completed fraud, the government need not prove damages. *Neder*, 527 U.S. at 25.

Defendant further argues that the final terms of the Nelco loan were fully disclosed and that the MetroBank board "indisputably approved" the loan. (Appellant's Br. at 34.) Defendant also argues that the board's only reason for removing Mr. Solomon was due to the presence of tax liens against him that could have clouded the chain of title. According to Defendant, by replacing Mr.

Solomon with TransTech he adequately addressed that concern.

There is substantial evidence, however, that the board conditioned its approval of the Nelco loan not only on the receipt of good and clear title, but also on the removal of Mr. Solomon from the transaction. The latter concern was spurred by Mr. Solomon's poor credit history and pattern of bad business practices. The jury heard testimony regarding this concern from several MetroBank board members and employees. It also saw documentary evidence expressly stating this condition.

As the evidence sufficiently establishes, Defendant schemed to defraud MetroBank by concealing Mr. Solomon's continued involvement in the transaction. *See United States v. Hill*, 197 F.3d 436, 444 (10th Cir. 1999) ("[T]he phrase 'scheme or artifice to defraud' simply requires a design, plan, or ingenious contrivance or device to defraud."). Following the April 6, 1999 board meeting at which these conditions were imposed, Defendant caused an attorney to prepare papers incorporating TransTech with Mr. Solomon as its sole shareholder. Mr. Solomon signed the incorporation papers on April 15, 1999. Defendant then had a MetroBank employee prepare a credit memorandum clearly listing TransTech's involvement in the Nelco loan and identifying Mr. Solomon as TransTech's sole owner. That credit memorandum was signed by Defendant on April 19, 1999, and placed into the credit file. The Nelco loan closed on April 21, 1999. There was evidence that Defendant did not present the revised transaction to the board and

that no MetroBank board member became aware of Mr. Solomon's continued involvement until after the loan closed. *See United States v. Cronic*, 900 F.2d 1511, 1513-14 (10th Cir. 1990) (noting that a defendant need not make an affirmative misrepresentation to violate § 1344(1)). The jury heard testimony from board members that Mr. Solomon's replacement with TransTech violated the board-imposed conditions. *Cf. United States v. Ventura*, 17 F. Supp. 2d 1204, 1208 (D. Kan. 1998) ("Banks are in the business of assuming risks. Section 1344(1) of the bank fraud statute, however, prohibits individuals from exposing a bank to a risk of loss that the bank did not knowingly assume.").

In addition, the government presented testimony that, following the loan closing, Defendant sought to book the $910,000 note that the bank had purchased for only $10,000 as $900,000 in income. The jury heard testimony that Defendant's sole source of income was derived from bank stock dividends and that MetroBank had to turn a profit in order to generate dividends. It was reasonable for the jury to infer, therefore, that Defendant concocted the Nelco loan in order to generate fictitious income for MetroBank. *See id.* ("A false representation by an individual as to the purpose of a loan may be sufficient to support a conviction of bank fraud under section 1344(1)." (citing collected appellate cases)). It was further reasonable for the jury to conclude that Defendant incorporated TransTech in order to mislead MetroBank about Mr. Solomon's continued involvement because Defendant required Mr. Solomon's

-28-

continued participation in and acquiescence to the scheme in order to obtain the $910,000 note with the intention of overbooking its value.

### 2. The Attempted Building Sale

The government presented testimony that a June 1999 OCC examination of MetroBank revealed that MetroBank had issued a number of questionable loans, had strained its operating capital, and had violated a number of lending laws, including statutes capping the bank's lending limit and restricting insider transactions. As a result, MetroBank and the OCC entered into a memorandum of understanding ("MOU") on October 13, 1999. That MOU was "designed specifically to control or limit" Defendant's actions, including his lending authority and his ability to withdraw dividends. (App. at 1486.) The MOU also prevented Defendant from affecting "[t]he acquisition or sale of any fixed asset owned by the bank involving more than $2,500." (App. at 2331; *see also* App. at 1488.) The MetroBank building was a fixed asset.

As noted above, the bankruptcy court converted Defendant's Chapter 11 proceedings to Chapter 7 liquidation on December 17, 1999. Four days later, MetroBank held a board meeting at which Defendant requested permission to sell unspecified bank assets. The board granted Defendant the authority to sell bank assets "subject to regulatory authority." (App. at 2338; *see also* App. at 1636.) The testimony reflected that this condition referred to OCC approval. At no point

-29-

did Defendant inform the board that his assets, including his bank stock, were now in the possession of the Chapter 7 trustee.

The jury heard testimony that Defendant contacted Mr. Phansalkar and, as detailed above, set in motion the proposed sale of the bank building. According to the testimony of board members present at the January 19, 2000 special board meeting, Defendant made no mention of the impending sale. Yet Mr. Phansalkar testified that Defendant called him after that meeting and told him that "everything went smoothly" and that the board had "approved the transaction." (App. at 1522.)

Defendant appears to argue that the board-mandated regulatory approval was not necessary because the building sale was coupled with a leaseback such that MetroBank would not have to cease operating at its present location. This argument defies logic. The exact structure of that sale is irrelevant. There is abundant evidence that Defendant attempted to effect a sale of the building and schemed to defraud MetroBank by circumventing both the OCC and the MetroBank board restrictions. Defendant's contention that he committed no crime because the sale never closed is equally perplexing. The law clearly punishes the scheme rather than the completed fraud, and for that reason requires no proof that the bank actually suffered damages. *Neder*, 527 U.S. at 25.

Defendant also asserts that a letter he submitted after his removal urging the MetroBank board to approve the sale establishes that he never attempted to

defy the sales restriction. The jury, however, heard the testimony of the incoming bank president that, in early January 2000, Defendant attempted to have the phrase "subject to regulatory approval" stricken from the December 21, 1999 meeting minutes. Thus, the jury could have reasonably inferred that his efforts to alter the meeting minutes was done in order to close the sale in secret.

## C.    § 1005

To prove a § 1005 violation, the government must establish that: "'(1) an entry made in bank records is false; (2) the defendant made the entry or caused it to be made; (3) the defendant knew the entry was false at the time he . . . made it; and (4) the defendant intended that the entry injure or defraud the bank or public officers.'" *United States v. Weidner*, 437 F.3d 1023, 1037 (10th Cir. 2006) (alteration in original) (quoting *United States v. Chaney*, 964 F.2d 437, 448 (5th Cir. 1992)). The purpose of the statute is to ensure that "upon an inspection of a bank, public officers and others would discover in its books of account a picture of its true condition." *United States v. Darby*, 289 U.S. 224, 226 (1933).

Defendant argues that he could not commit a § 1005 violation until the MetroBank board meeting minutes in question became "official" minutes. The minutes at issue did not become "official" until approved by the board at the June 23, 1999 meeting. The minutes were not approved until after Virginia Evans, a MetroBank employee, alerted the OCC examiners that the proposed minutes

omitted the board's statement that its approval of the Nelco loan was conditioned on removing Mr. Solomon from the transaction. Regardless of when the minutes became official, there was ample evidence from bank employees and OCC examiners that neither set of minutes would have provided inspectors with a complete account of the loan. Defendant counters that the May 13, 1999 meeting minutes fully disclosed Mr. Solomon's continued involvement and "the internal dispute regarding whether [his continued participation] complied with the board's conditions." (Appellant's Reply Br. at 13.) However, the falsification of the original minutes "is rendered no less false simply because, through considerable effort and a piecing together of minute details, the bank might have been able to discover the truth." *Weidner*, 437 F.3d at 1037 (quoting *United States v. Luke*, 701 F.2d 1104, 1108 n.7 (4th Cir. 1983)).

In addition, the testimony made clear that Defendant instructed Chris Rauchs, a contract typist, to delete the reference restricting Mr. Solomon's participation in the loan. The testimony reveals that Defendant ordered Ms. Rauchs to remove mention of that condition and that Ms. Rauchs complied with that order. "Under § 1005, 'an omission of material information qualifies as a false entry.'" *Weidner*, 437 F.3d at 1037 (quoting *United States v. Cordell*, 912 F.2d 769, 773 (5th Cir. 1990)). It is beyond cavil that Defendant omitted material information by deleting the condition of loan approval. Moreover, it is inconsequential that Defendant did not personally make the false entry: "'it

suffices that he set in motion management actions that necessarily caused [bank personnel] to make false entries.'" *Id.* (alteration in original) (quoting *United States v. Wolf*, 820 F.2d 1499, 1504 (9th Cir. 1987).

## II.     Sixth Amendment Right to Chosen Counsel

Due to Defendant's bankruptcy, he received appointed counsel on December 9, 2003. Because trial was set to begin January 12, 2004, Defendant's counsel moved for a *pro forma* continuance in order to allow additional time for preparation. This continuance was granted, and trial was rescheduled for April 12, 2004.

On April 2, 2004, Defendant met *in camera* with the district court. At this meeting, Defendant explained that he wished to terminate his court-appointed attorney because he believed counsel's strained schedule prevented counsel from adequately preparing for trial. Defendant also informed the district court that he was attempting to retain private counsel, but that his bankruptcy proceedings and divorce proceedings complicated his ability to do so. He stated that he had petitioned the Colorado divorce court to release marital estate funds for that purpose and that he had an attorney lined up to begin working on the defense as soon as those funds were approved. The district court interpreted Defendant's request as a second motion for a continuance and denied that motion.

At an April 9, 2004 hearing, however, the district court disqualified Mr.

Solomon's counsel.  That required rescheduling trial for June 14, 2004.  Then, on April 23, 2004, Mr. Solomon was deemed incompetent to stand trial.  This led to a lengthy trial delay, which the district court admonished both parties' counsel to use in preparing for trial.  The prosecution did not file a superseding indictment eliminating the conspiracy charges until February 16, 2005; apparently the prosecution was waiting to see if the forced administration of psychotropic drugs would return Mr. Solomon to competency.  Defendant's trial was set for April 11, 2005.

On March 15, 2005, the Colorado divorce court finally approved Defendant's request for marital estate funds, but did not release those funds until March 29, 2005.  Earlier on March 29, 2005, Defendant filed what the court interpreted to be Defendant's third motion for a continuance.  This request was predicated on the need for further discovery, as the prosecution previously had failed to turn over certain discovery materials.  On March 31, 2005, Defendant advised the court of the change in his financial status.

The district court conducted a hearing on April 4, 2005, to examine the continuance issue.  It then denied the continuance, citing the age of the case and the "substantial likelihood" that Defendant would make an "eleventh-hour plea" for another continuance.  (App. at 241.)  The district court ordered Defendant's court-appointed counsel to remain as defense counsel alongside Defendant's newly hired counsel.  Defendant sought reconsideration of the district court's

ruling on April 5, 2005, and this motion was promptly denied.

Defendant argues that the district court's refusal to grant the third continuance constituted an abuse of discretion that violated his Sixth Amendment right to be represented by counsel of his choice.

Following the Supreme Court's decision in *United States v. Gonzalez-Lopez*, --- U.S. ----, 126 S. Ct. 2557 (2006), the only question facing this court is whether the district court "wrongly denied" the continuance that would have permitted sole representation by Defendant's hired counsel. *Id.* at 2563; *accord United States v. Zangwill*, 197 Fed. App'x 888, 891 n.1 (11th Cir. 2006) (unpublished) ("In order for the automatic rule of *Gonzalez-Lopez* to apply, in other words, it must first be shown that the trial court "wrongly" or "erroneously" denied the defendant his choice of counsel."); *United States v. Hickey*, No. 97-0218, 2006 WL 1867708, at *14 (N.D. Cal. July 6, 2006) ("[A]s a threshold matter for the *Gonzalez-Lopez* rule to apply, a court must have 'wrongly' denied defendant's choice of counsel."). We review the district court's decision for abuse of discretion, *United States v. Dowlin*, 408 F.3d 647, 663 (10th Cir. 2005), balancing the defendant's "'constitutional right to retain counsel of . . . choice against the need to maintain the highest standards of professional responsibility, the public's confidence in the integrity of the judicial process and the orderly administration of justice,'" *United States v. Mendoza-Salgado*, 964 F.2d 993, 1015 (10th Cir. 1992) (alteration in original) (quoting *United States v. Collins*,

-35-

920 F.2d 619, 626 (10th. Cir. 1990)). In striking that balance, we consider whether: 1) the continuance would inconvenience witnesses, the court, counsel, or the parties; 2) other continuances have been granted; 3) legitimate reasons warrant a delay; 4) the defendant's actions contributed to the delay; 5) other competent counsel is prepared to try the case; 6) rejecting the request would materially prejudice or substantially harm the defendant's case; 7) the case is complex; and 8) any other case-specific factors necessitate or weigh against further delay. *Id.* at 1015.

There is no evidence that the district court's denial was due to unreasonable or arbitrary concerns. Although we question whether the district court could entirely fault Defendant for the numerous delays in bringing this case to trial, that was not the only reason provided. The age of the case was a serious concern. While not a particularly complex case, it involved multiple instances of fraud. Thus, it required testimony of numerous witnesses. Due to the scheduling burdens of the district courts, "assembling the witnesses, lawyers, and jurors at the same place at the same time" necessitates that "broad discretion . . . be granted trial courts on matters of continuances; only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel." *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) (quotation omitted); *see also Gonzalez-Lopez*, 126 S.Ct. at 2565-66 (recognizing "a trial court's wide latitude in balancing the right to counsel of

-36-

choice against the needs of fairness and against the demands of its calendar")
(citation omitted).

While the Supreme Court has stated that those without the means to hire
counsel have no cognizable complaint in the face of adequate court-appointed
representation, *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624
(1989), the right to hire preferred counsel "derives from a defendant's right to
determine the type of defense he wishes to present." *Mendoza-Salgado*, 964 F.2d
at 1014. Defendant, however, fails to argue on appeal how the denial of the
continuance affected trial preparation or defense strategy, or how the "hybrid
representation" foisted upon him by the district court negatively impacted his
defense. Even if Defendant had made such an argument, the record would not
support it. Defendant received notice that funds would be released more than one
week before trial. Defendant had contacted his hired attorney nearly one year
before, and it was understood that the attorney would begin working on the case
as soon as it became clear that funds would be available. Moreover, the record
contains no evidence that hired and appointed counsel differed in their approach
to the case. The district court noted its respect for appointed counsel's ability on
several occasions, and appointed counsel in turn observed that hired counsel was
a highly experienced criminal defense attorney. Although Defendant expressed
dissatisfaction with what he perceived to be a lack of preparedness on the part of
appointed counsel at the April 2, 2004 *in camera* meeting, there is no evidence

that Defendant's opinion persisted, especially after the lengthy continuance caused by Mr. Solomon's incompetency and the prosecution's subsequent delay in filing a superseding indictment.

For the foregoing reasons, we are unable to say that the district court's denial of Defendant's third motion for a continuance on the eve of trial constituted an abuse of discretion.

## III. Sentencing

Defendant's ninety-six month term of imprisonment resulted from a 12-level enhancement under U.S.S.G. § 2F1.1(b)(1) for intending to cause a $2 million loss; four separate 2-level enhancements for violation of a memorandum of understanding under U.S.S.G. § 2F1.1(b)(4)(B), more than minimal planning under U.S.S.G. § 2F1.1(b)(2), obstruction of justice under U.S.S.G. § 3C1.1, and abuse of a position of private trust under U.S.S.G. § 3B1.3;[7] and an eighteen-month increase above the Sentencing Guidelines range pursuant to § 3553. Defendant also was ordered to pay $80,000 restitution. Defendant appeals each of these sentencing determinations.

In reviewing sentencing decisions, we review a district court's factual findings for clear error but its legal determinations de novo. *United States v.*

---

[7] These provisions correspond to the 1998 edition of the Sentencing Guidelines, which the district court correctly referenced.

*Kristl*, 437 F.3d 1050, 1054 (10th Cir. 2006). Similarly, we review the legality of restitution orders de novo, the underlying factual findings for clear error, and the amount for abuse of discretion. *United States v. Osbourne*, 332 F.3d 1307, 1314 (10th Cir. 2003). We also review the district court's interpretation of the Mandatory Victim's Restitution Act ("MVRA") de novo. *United States v. Barton*, 366 F.3d 1160, 1164-65 (10th Cir. 2004).

Because we have reversed Defendant's conviction for willful misapplication in association with the Fischer automobile loan, resentencing will be necessary. Nevertheless, we address Defendant's sentencing arguments since the same issues are certain to arise at resentencing.

### A. Intended Loss

Under § 2F1.1(b)(1)(M) of the 1998 Sentencing Guidelines, a sentence should increase 12 levels for a loss of more than $1.5 million but less than $2.5 million. Where the intended loss is greater than the actual loss, the amount of intended loss should be used for sentence calculation purposes. *See* U.S.S.G. § 2F1.1(b)(1) cmt. 8 (1998). The district court granted the enhancement based on Defendant's attempted sale of the MetroBank building for $2 million; no actual loss occurred. The district court did, however, reject the government's suggestion that the intended loss totaled $6 million because insufficient evidence supported the government's asserted valuation. Rather, the district court determined that

Defendant intended to defraud MetroBank of $2 million by selling the MetroBank building to a financially incapable entity owned by Defendant's then-wife for that amount.

Defendant argues that the intended loss was zero because he could not have sold the building without MetroBank board and/or OCC regulatory approval and would not have been unable to dividend out that money. Certainly, we have held that "the loss defendant subjectively intended to cause is not controlling if he was incapable of inflicting that loss." *United States v. Galbraith*, 20 F.3d 1054, 1059 (10th Cir. 1994) (finding intended loss inapplicable where defendant's conduct occurred in context of undercover sting operation that prevented loss to "victim," a non-existent pension fund); *accord United States v. Ensminger*, 174 F.3d 1143, 1146 (10th Cir. 1999) (reversing sentencing enhancement after concluding that scheme to use falsified seizure order to have U.S. Marshall's Office seize real property and/or sale proceeds had no chance of succeeding); *United States v. Santiago*, 977 F.2d 517, 524 (10th Cir. 1992) (reducing value of intended loss to comport with "economic reality" of what insurance company would have paid for stolen vehicle, not amount defendant claimed vehicle was worth). However, contrary to Defendant's suggestion, the district court did not find that the sale and dividend payment never would have occurred, but that Defendant would not have been "entitled" to take either action. (App. at 2208.)

The district court observed that Defendant had become "a desperate man"

(App. at 2208) intent on making $2 million. The district court further observed that the evidence presented at trial established Defendant's desire to obtain this money and that he "did not intend to jeopardize his plan to sell the building by exposing himself to the risk that the board would reject the transaction or delay it or impose conditions that would have made the transaction impossible to consummate." (App. at 2192.) The incoming board president testified that Defendant attempted to delete from the board minutes the restriction on Defendant's ability to sell MetroBank assets. Defendant also made no mention of the impending sale to the board but informed the real estate attorney that the board had approved the transaction. Indeed, only the inadvertent, last-minute discovery of the looming sale by the incoming bank president prevented the transaction from closing. Defendant's "surreptitious and furtive" actions (App. at 2192) and near success render his situation insufficiently comparable to those in which this court found "no possibility for [the defendants] to have succeeded." *Ensminger*, 174 F.3d at 1146 (noting that "[n]o record facts suggest that there was even a remote probability" of completing the scheme).

Defendant also contests the finding of an intended loss of $40,000 in conjunction with the Reisig real estate loan. Because this amount does not increase the intended loss into the next loss range as set by U.S.S.G. § 2F1.1(b)(1)(M), we need not consider Defendant's argument.

**B      Memorandum of Understanding**

The district court imposed a two-level enhancement under U.S.S.G. § 2F1.1(b)(4)(B) for violating an administrative order.  On October 13, 1999, the MetroBank board and the OCC agreed that Defendant would operate MetroBank consistent with the provisions of a memorandum of understanding ("MOU").  The OCC initially attempted to impose a "cease and desist order" or a "consent order." According to the testimony of an OCC examiner, those terms are used interchangeably to define a publicly available punitive order.  After some negotiation with MetroBank, the OCC lowered its punishment to the MOU, which is a confidential agreement between the OCC and the bank that acts as a rehabilitory measure "designed to . . . return [the bank] to a satisfactory condition."  (App. at 1485.)  The district court correctly concluded that the MOU qualifies under U.S.S.G. § 2F1.1(b)(4)(B) as an administrative order. *See United States v. Spencer*, 129 F.3d 246, 252 (2d Cir. 1997) (finding formal adversary proceeding unnecessary where negotiation between parties results in binding agreement).

The extent to which the MOU restricted Defendant's conduct is another matter.  Article XXI of the MOU stated in pertinent part:  "The acquisition or sale of any fixed assets owned by the bank involving more than $2,500 should require prior Board approval."  (App. at 2331.)  The district court determined that Defendant's attempted sale of the bank building, a fixed asset within the meaning

of the provision, violated Article XXI. Defendant argues that because the provision's language is precatory, not mandatory, his actions did not violate the MOU.

We agree. In *United States v. Tisdale*, 248 F.3d 964, 977 (10th Cir. 2001), this court analyzed the difference between "should" and "shall." After examining the words' respective dictionary definitions, noting the Supreme Court's "directive that courts are to give words their ordinary meaning," and commenting favorably upon the Second Circuit's interpretation of this issue in *United States v. Maria*, 186 F.3d 65, 70 (2d Cir. 1999), we determined that "should" is a permissive construction. *See Qwest Corp. v. FCC*, 258 F.3d 1191, 1200 (10th Cir. 2001) ("The term 'should' indicates a recommended course of action, but does not itself imply the obligation associated with 'shall.'" (citing *Maria*, 186 F.3d at 70)). The MOU only recommended board approval; it did not mandate it. Accordingly, the district court erred in imposing the two-level enhancement under U.S.S.G. § 2F1.1(b)(4)(B).

## C.   Miscellaneous Enhancements

The district court imposed three other two-level enhancements. Defendant argues only that these enhancements "should be set aside and remanded for reconsideration if this Court vacates any of the underlying convictions" because the district court's findings would necessarily rely on overturned convictions.

(Appellant's Br. at 55.)

As illustrated below, however, the district court's findings were based largely on Defendant's actions with respect to transactions other than the Fischer automobile loan. Consequently, we see no reason why the district court's meticulously explained findings are rendered erroneous.

### 1. More Than Minimal Planning

The district court correctly applied a 2-level enhancement for more than minimal planning pursuant to U.S.S.G. § 2F1.1(b)(2)(A) after finding "with a very, very high degree of certainty" that Defendant's crimes involved substantial planning. (App. at 2138.) The district court relied primarily on the attempted sale of the bank building, which the court considered "far and away the easiest" example because the sale "involved a course of conduct that began several weeks" prior to the planned closing. (App. at 2138.) Indeed, the district court saw "no need to address anything other than the Reisig loan and the Nelco loan and the proposed sale of the bank property." (App. at 2138.)

### 2. Obstruction of Justice

The district court also properly imposed a 2-level enhancement under U.S.S.G. § 3C1.1 for obstruction of justice after finding that Defendant offered materially false testimony. We need not decide whether Defendant obstructed justice in connection with the Fischer automobile loan in order to uphold this

enhancement. The district court highlighted six instances in which Defendant provided materially false testimony regarding the Reisig and Nelco real estate loans and the attempted building sale.

### 3. Abuse of a Position of Private Trust

Lastly, the district court appropriately enhanced Defendant's sentence two levels under § 3B1.3 for abusing his position as MetroBank CEO. The district court stated that Defendant's position rendered application of the enhancement "almost self-proving" and that the evidence clearly illustrated Defendant's coercive manner and deceptive actions. (App. at 2139.) Moreover, the district court correctly noted that every single count involved an abuse of private trust.

### D. Unreasonableness

Defendant argues that his sentence was "patently unreasonable" in part because of "rhetorically charged" statements made by the district court. (Appellant's Br. at 59.) He argues that these statements ignore the fact that MetroBank was not harmed financially and, therefore, that his sentence was wrongly calculated. In making this argument, Defendant reiterates his argument above related to the 12-level enhancement. As detailed above, we are not persuaded by that argument. In addition, it is clear from the sentencing transcript that the district court articulated well-grounded reasons under its § 3553 analysis.

Defendant also contends that the district court impermissibly departed

upward by eighteen months without providing presentence notice of its intention to do so.  Federal Rule of Criminal Procedure 32(h) states:

> Before the court may depart from the applicable sentencing range on a ground not identified for departure either in the presentence report or in a party's prehearing submission, the court must give the parties reasonable notice that it is contemplating such a departure. The notice must specify any ground on which the court is contemplating a departure.

When, as here, a district court enhances the recommended Guidelines range under the § 3553(a) factors, "the increase . . . is called a 'variance.'" *United States v. Atencio*, 476 F.3d 1099, 1101 n.1 (10th Cir. 2007).  After *United States v. Atencio*, Rule 32(h) applies to both variances and departures.  Therefore, district courts must "give advance notice of their intent to sentence above or below the identified advisory Guidelines range." *Id.* at 1104.

On the first day of Defendant's sentencing, the district court acknowledged that, because it had not given notice of its intent to depart, that was "not even an option."  (App. at 2165.)  It then stated simply that it would issue a Guidelines sentence or an outside-the-Guidelines sentence.  This is plainly insufficient under Rule 32(h).  *See Atencio*, 476 F.3d at 1104 ("Rule 32(h) . . . leave[s] no doubt that the defendant has a right to know in advance the very ground upon which the district court might upwardly depart or vary."); *see also United States v. Calzada-Maravillas*, 443 F.3d 1301, 1304 (10th Cir. 2006) ("The notice requirement is not burdensome—its key component is that the parties have notice

-46-

in advance of the sentencing hearing.").  Before resentencing, the district court must provide the requisite detailed notice if it intends to vary from the recommended Guidelines sentence.

Even though Defendant was sentenced prior to *Atencio*, the notice requirement still applies.  What does not apply, per *Atencio*, is the requirement that Defendant object to the lack of notice during sentencing in order to preserve the issue for appeal.  *Atencio*, 476 F.3d at 1105 n.6 (overruling *United States v. Bartsma*, 198 F.3d 1191 (10th Cir. 1999), but applying objection requirement "prospectively").

## E.    Restitution

The district court ordered Defendant to pay $80,000: $40,000 each to Mike Campbell and Jon Reisig for defrauding them in connection with the Reisig real estate loan.  Defendant asserts that the award should be cut in half or eliminated entirely because both buyer and seller received exactly what they expected.  The district court, however, stated that Defendant manipulated the parties in a "classic dishonest broker situation" in order to carve out $40,000 for himself and co-defendant Solomon.  (App. at 2214.)  Defendant stripped Mr. Campbell of what he could have gotten absent the deceit, while Defendant led Mr. Reisig to overpay by $40,000 from the moment the sale was proposed.  Given that Defendant victimized both parties to the sale, we find the district court's restitution award

entirely appropriate.

## CONCLUSION

Having determined that insufficient evidence supported Defendant's conviction for willful misapplication in connection with the Fischer automobile loan, that the district court incorrectly applied a 2-level sentencing enhancement for violating an administrative order, and that the district court failed to adequately notify Defendant of its intention to vary upward, we **REVERSE** Defendant's conviction on Count One and **REMAND** for resentencing consistent with the rulings made and guidance given in this opinion.