**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

JEFFREY LEMON, JR.,

      Defendant - Appellant.

No. 16-6213
(D.C. No. 5:15-CR-00185-R-1)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **TYMKOVICH**, Chief Judge, **BALDOCK**, and **BRISCOE**, Circuit Judges.
_____

A jury convicted Defendant Jeffrey Lemon, Jr., of seventeen counts of mail theft by a postal service employee in violation of 18 U.S.C. § 1709. Defendant appeals his convictions, claiming the district court erred by (1) denying his motion for a continuance filed the eve of trial; (2) admitting Defendant's confession made to postal investigators; (3) admitting evidence of Defendant's gambling; (4) excluding Defendant's repudiation of his prior confession; and (5) instructing the jury that the Government was under no obligation to use any particular investigation method. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

_____

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

I.

The record reveals Defendant started working at the post office in Warr Acres, Oklahoma, in November 2013. As a postal service employee clerk, Defendant prepared mail for carriers, sold stamps and money orders, and received mail from customers. In June 2015, a customer of the Warr Acres post office filed a complaint with the postal service, claiming a money order she purchased and mailed to the Department of Treasury to pay her taxes never reached its destination. The USPS Office of Inspector General (OIG) investigated this complaint and found someone had cashed the money order at the Warr Acres post office. Further investigation revealed that Clerk Number 4 had handled this transaction. As more customers complained about money orders never reaching their destinations, the OIG learned that Clerk Number 4 had cashed every one of the lost money orders.

With evidence in hand that Clerk Number 4 might have information about the lost money orders, OIG investigators Rey Santiago and Mitch Davis went to Warr Acres to interview Clerk Number 4. Defendant was Clerk Number 4. Santiago and Davis arrived at the post office during business hours on July 7, 2015. They first spoke with Defendant's manager, Randy Harrelson, and asked him to retrieve Defendant for an interview. Harrelson notified Defendant that investigators were there to speak with him and escorted Defendant back to his office. Harrelson then left the office, shutting—but not locking—the door on the way out. In the office, the investigators did not restrain Defendant in any way. Santiago and Davis were both in plain clothes, and while they were armed, neither of their weapons were visible.

Santiago and Davis explained they wanted to speak to Defendant because missing money orders had been cashed at the Warr Acres post office. Before asking any substantive questions, however, Santiago and Davis specifically told Defendant he was not under arrest and administered a *Garrity* warning, advising Defendant—both orally and in writing—(1) he had the right to remain silent if his answers would tend to incriminate him; (2) anything he said or did may be used as evidence against him in a court of law; (3) he would not be disciplined solely for remaining silent; and (4) the interview was strictly voluntary and he could leave or stop answering questions at any time.[1] Defendant heard and read these rights, then signed a form, initialing next to each of these rights to acknowledge he understood them. The form also stated, "No promises or threats have been made to me and no coercion of any kind has been used against me." Santiago explained to Defendant what coercion meant in case he did not understand, and then Defendant also signed beneath this statement. Because the investigators did not consider Defendant to be in custody, they neither administered a *Miranda* warning nor recorded the interview.

After acknowledging he understood his rights, Defendant agreed to participate in the interview. Defendant admitted he had stolen money orders customers had mailed, cashed them, and kept the money. When a customer would hand him an envelope to mail that Defendant knew contained a money order, he would remove the money order, forge a signature and driver's license number, and cash it himself.

---

[1] *See Garrity v. New Jersey*, 385 U.S. 493 (1967) (holding the government's threat of loss of employment to obtain incriminatory evidence against an employee violates the Fourteenth Amendment).

Santiago brought copies of ten suspect money orders and asked Defendant to initial the ones he had stolen and cashed. Defendant admitted cashing some of the money orders but denied cashing others. Defendant estimated he profited between $6000–7000 in this endeavor. Defendant denied stealing anything else at work. Trying to understand Defendant's motive, Santiago asked Defendant if he had financial troubles. He admitted his wages were being garnished for a student loan and, while denying he had a gambling problem, said he gambled two or three nights every week.

At the end of the interview, Santiago asked Defendant if he wanted to write a handwritten statement to include in the administrative report that the investigators would present to OIG management and the U.S. Attorney's Office. While Defendant was not required to write a statement, Santiago gave Defendant the opportunity to do so since he had expressed remorse. Santiago stepped out of the office to talk with the manager, and when he returned, Defendant had barely written anything. To help Defendant decide what to write in his statement, Santiago reviewed the notes of the interview with Defendant. Defendant wrote his statement, admitting stealing and cashing most of the money orders he was shown but denying stealing anything else in the post office. Defendant then signed this statement under penalty of perjury.

After Defendant signed his statement, his manager placed him on unpaid administrative leave. The investigators escorted Defendant to his work area, locker, and car to see if they could find any evidence of the crime. They did not find evidence of stolen mail in any of these locations but did find a Newcastle Gaming

4

player's club card in Defendant's car. This entire encounter lasted approximately one and a half hours.

Either that night or the next day, with the help of union representatives, Defendant wrote a statement disclaiming all responsibility for the lost money orders. In this statement, Defendant stated the investigators pressured him into making a confession by "testing [his] compassion for the victims." In three subsequent investigative interviews, Defendant denied stealing and cashing money orders.

In September 2015, a grand jury indicted Defendant on eighteen counts of mail theft by a postal service employee. The court set trial for November 2015 but later continued it, at Defendant's request, to December 1, 2015. The parties made four relevant pretrial motions. First, Defendant filed a motion to suppress the July 7 statements he made to investigators. Defendant argued he was in custody and thus entitled to *Miranda* warnings. Defendant additionally argued the statements were not voluntary. In a supplement to that motion, Defendant argued USPS regulations, requiring all employees to (1) obey their supervisor and (2) cooperate with investigations, established he was in custody.[2] At a hearing on this motion, the district court concluded, despite the regulations, Defendant was not in custody. Calling the interview a "classic example of . . . voluntary," the district court

---

[2] The two relevant regulations are found in the USPS Employee and Labor Relations Manual. The first regulation states "Employees must obey the instructions of their supervisors. If an employee has reason to question the propriety of a supervisor's order, the individual must nevertheless carry out the order . . . ." § 665.15. The second regulation states, "Employees must cooperate in any postal investigation, including Office of Inspector General investigations." § 665.3.

5

explained its ruling. The court reasoned that no evidence suggested Defendant knew these regulations required him to obey his manager and cooperate with OIG investigations. Furthermore, even if Defendant knew of the regulations, the investigators had not coerced him. They advised him of his Fifth Amendment right to remain silent and told him his cooperation was entirely voluntary. Finally, the investigators were in plain clothes, not in uniform, with their weapons concealed.

The second relevant pretrial motion was the Government's motion in limine to exclude Defendant's statements made after July 7, in which he denied stealing and cashing customers' money orders, as inadmissible hearsay. The district court granted the motion because without Defendant available for cross-examination, the statements were "clearly hearsay." Third, Defendant filed a motion in limine to exclude evidence of Defendant's gambling, contending it was "highly prejudicial" and "not relevant." The district court denied the motion because, contrary to Defendant's argument, it was "extremely relevant" evidence.

Lastly, at 6pm the night before trial, Defendant filed a motion for a continuance. Defendant sought to substitute attorneys because he disagreed with his court-appointed attorney, William Earley, on trial strategy, and there had been a severe breakdown in communication between Defendant and Earley. Specifically, Defendant disagreed with Early on whether to take a guilty plea and whether to testify. He sought to have Jeffrey Wise, an attorney he had retained the day before, try the case instead. Defendant explained he filed this motion at the last minute because he had been unable to afford an attorney until the day before trial. The

6

district court denied the continuance and required Earley to proceed with the case. The court reasoned Defendant provided insufficient justification for waiting until the eve of trial to express his dissatisfaction with Earley. The jury had been summoned and was waiting to be empaneled. The Government had subpoenaed twenty witnesses. Furthermore, the court reasoned Earley was an outstanding attorney and any breakdown in communication was not Earley's fault. The court then ensured Defendant understood that only he could decide whether to testify.

Trial commenced. The Government examined thirteen witnesses whose money orders had been stolen. Defendant decided not to testify. During trial, Defendant challenged the Government's credibility by showing the investigators did not use all the available investigatory techniques at its disposal in investigating Defendant. Specifically, the Government did not record the July 7 interview, obtain video surveillance, use tracker devices, or obtain Defendant's bank records. In response to Defendant's attempt to attack the Government's investigation, the Government asked for the following jury instruction:

> In attempting to prove its case, the Government is under no obligation to use all of the investigative methods that are available to it or to use any particular method. The question is whether the evidence presented is sufficient to convince you beyond a reasonable doubt of the Defendant's guilt.

Defendant opposed this jury instruction, arguing it undermined his defense. The court allowed the instruction, reasoning it routinely gave that instruction and the instruction was a correct statement of law. After hearing all evidence, the jury

convicted Defendant of seventeen counts of mail theft, and the court sentenced him to twelve months' imprisonment and two years' supervised release. Defendant appealed the conviction, raising five issues on appeal. We answer each issue in the order Defendant presented them.

## II.

## A.

First, Defendant argues the district court violated his Sixth Amendment right to counsel by denying Earley's motion to withdraw and Wise's motion for a continuance. The evening before trial, after Wise entered his appearance for Defendant, Earley filed a motion to withdraw. Wise then filed a motion for a continuance until March 2016—at least three months later—to allow him time to prepare for trial. Of course, the Sixth Amendment guarantees criminal defendants who can afford an attorney the right to the attorney of their choosing. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). This right, however, is not absolute, as it sometimes stands in tension against "'the need to maintain the highest standards of professional responsibility, the public's confidence in the integrity of the judicial process and the orderly administration of justice.'" *United States v. Flanders*, 491 F.3d 1197, 1216 (10th Cir. 2007) (quoting *United States v. Mendoza-Salgado*, 964 F.2d 933, 1015 (10th Cir. 1992)). A district court violates a defendant's right to counsel of his choice when it "'wrongly denie[s]' the continuance that would have permitted sole representation by Defendant's hired counsel." *Id.* We review such claims for abuse of discretion. *Flanders*, 491 F.3d at 1216. "[O]nly an unreasoning

8

and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." *Morris v. Slappy*, 461 U.S. 1, 11–12 (1983) (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)).

In denying Defendant's motion for a continuance and substitution of counsel, the court considered the following: (1) Earley, who is "not only a competent lawyer, but an outstanding lawyer," was prepared to try the case, as opposed to Wise who needed three months to prepare;[3] (2) the inconvenience to the court, jury, and Government's twenty subpoenaed witnesses; (3) the lack of justification for waiting until the eve of trial, which had been set for some time, to express dissatisfaction with Earley; and (4) any breakdown in communication between Defendant and Earley was not Earley's fault. These are not "unreasoning" or "arbitrary" concerns. *See Flanders*, 491 F.3d at 1216. Therefore, the district court did not violate Defendant's Sixth Amendment right to counsel but rather properly exercised its discretion in denying the Defendant's motion for a continuance.

---

[3] Defendant argues the court inappropriately considered Earley's competence because *Gonzalez-Lopez* held a defendant's denial of his right to counsel of choice is complete, "regardless of the quality of the representation he received." 548 U.S. at 148. *Gonzalez-Lopez* held that a defendant need not show prejudice to bring a claim for the denial of an attorney of the defendant's choice. *Id.* That is, a defendant's right to counsel of his choice can still be violated if he has a good attorney. This rule does not prevent a district court from considering, as a practical matter, whether a trial can proceed as scheduled because a competent attorney is prepared to try the case. In fact, this Court has specifically held whether other competent counsel is available to try the case is an appropriate consideration for a district court. *Flanders*, 491 F.3d at 1216.

9

B.

Defendant's second argument on appeal is that the court should have suppressed his statements made to investigators on July 7 because he was in custody and thus entitled to *Miranda* warnings prior to the interview. This Court accepts a district court's factual findings as true unless they are clearly erroneous and reviews a district court's determination that a defendant was not in custody for *Miranda* purposes *de novo*. *United States v. Chee*, 514 F.3d 1106, 1112 (10th Cir. 2008). One is only entitled to *Miranda* warnings prior to "custodial interrogations." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). To determine if someone is in custody for *Miranda* purposes, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). If a reasonable person in the suspect's position "would reasonably believe her freedom of action had been curtailed to a 'degree associated with a formal arrest,'" the suspect is in custody. *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam)). Three factors bear upon whether a defendant is in custody: (1) the suspect is not aware he does not have to answer questions or may end the interview whenever he wants; (2) the questioning is prolonged and accusatory in nature; (3) the suspect is questioned in a police-dominated atmosphere. *Id.* at 1518–19.

As to the first factor, the investigators made Defendant abundantly aware he did not have to answer questions and could end the interview whenever he wanted.

10

The investigators told Defendant he was not under arrest and any participation in the interview was voluntary. Defendant even signed a *Garrity* form acknowledging he understood his participation was voluntary. Defendant argues he was unaware that he did not have to participate because postal regulations required him to follow his manager's direction and cooperate in all OIG investigations. No evidence exists, however, establishing Defendant knew of these postal regulations. Even if he was aware of such regulations, this in no way negates the fact that he was also aware that he was not under arrest and had the right to remain silent and end the interview at any time. The investigators could not have made Defendant's rights more clear. Therefore, this first factor weighs heavily against the Defendant being in custody during the interview.

As to the second factor, if the encounter "progresses beyond a short investigatory stop, a custodial environment is more likely." *Id.* at 1518. This factor is concerned about whether a "prolonged accusatory questioning . . . create[d] a coercive environment from which an individual would not feel free to leave." *Id.* While the hour-and-a-half encounter between the investigators and Defendant was not so prolonged that it "create[d] a coercive environment from which an individual would not feel free to leave," it indeed "progresse[d] beyond a short investigatory stop." Therefore, this factor weighs slightly in favor of finding Defendant was in custody.

The third *Griffin* factor indicates "[w]here police are in full control of the questioning environment, custody is more easily found." *Id.* at 1518–19. This factor

11

contemplates situations in which the suspect "feels completely at the mercy of the police." *Berkemer v. McCarty*, 468 U.S. 420, 438 (1984). We cannot say Defendant was "completely at the mercy of the police" here. First, only two investigators questioned Defendant. *See id.* (explaining that being confronted by one or two police officers "further mutes [a suspect's] sense of vulnerability"). Second, the investigators were in plain clothes, not uniforms. Third, while they carried weapons, the weapons were not visible to Defendant. Fourth, the investigators interviewed Defendant, not in an unfamiliar environment, but in Defendant's own work place where he had spent numerous hours every week for almost two years. No evidence exists that the investigators dominated the environment to the extent that Defendant vulnerably felt at the mercy of the investigators. Thus, this factor weighs in favor of finding Defendant was not in custody. In light of these three factors, especially considering investigators told Defendant he was not under arrest, a reasonable person in the suspect's position would not "reasonably believe [his] freedom of action had been curtailed to a 'degree associated with a formal arrest.'" Therefore, the district court did not err in holding Defendant was not in custody and not entitled to *Miranda* warnings before the interview.[4]

---

[4] Defendant also argues his July 7 statements made to Santiago and Davis were involuntary. To determine whether a statement was voluntary, this court considers whether "the government obtained the statements by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Erving L.*, 147 F.3d 1240, 1248–49 (10th Cir. 1998). "[A] confession is only involuntary under the Fourteenth Amendment if the police use coercive activity to undermine the suspect's ability to exercise his free will." *Id.* at 1249. Defendant makes *no* argument the investigators engaged in coercive activity.

Defendant's third argument on appeal is that evidence of his gambling was irrelevant and unfairly prejudicial and, thus, should not have been admitted. In addition to allowing Santiago to describe that Defendant said he gambled two to three times per week during their interview, the court admitted casino records of dates Defendant gambled, as recorded by Defendant's player's cards.[5] While these casino records also showed the total amount Defendant lost gambling, the court instructed the jury to not consider those amounts because they were not "sufficiently reliable." In the district court, Defendant's motion in limine argued admitting this evidence violated 404(b).[6] We review a district court's decision to admit evidence for abuse of discretion and will only reverse if its ruling is "arbitrary, capricious or whimsical" or is not "within the bounds of permissible choice." *Mares*, 441 F.3d at 1156.

Federal Rule of Evidence 404(b) states: "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a

---

To the contrary, the fact that Defendant admitted to stealing and cashing some of the money orders but denied other accusations indicates investigators were not coercing him to answer in a certain way. Because the record contains no evidence, other than Defendant's self-serving out-of-court statements, that investigators coerced Defendant into confessing, the district court did not err in admitting Defendant's July 7 statements.

[5] The casinos maintained these records through Defendant's player's cards. Casinos issue these personal cards to patrons, thereby allowing the casinos to record a player's activity and provide promotions.

[6] Therefore, Defendant waived any argument admitting the evidence violated any other evidentiary rule. Encompassed in the Fed. R. Evid. 404(b) analysis, however, are the Fed. R. Evid. 401 and 403 analyses Defendant raises for the first time on appeal. *See United States v. Mares*, 441 F.3d 1152, 1156 (10th Cir. 2006).

particular occasion the person acted in accordance with the character. The evidence may be admissible for another purpose, such as proving motive . . . ." Evidence is admissible under 404(b) if: (1) it is offered for a proper purpose; (2) it is relevant; (3) the probative value of the evidence is not substantially outweighed by its potential for unfair prejudice; and (4) the court, upon request, instructs the jury that the evidence must only be considered for the proper purpose for which it was admitted. *Huddleston v. United States*, 485 U.S. 681, 691–92 (1988).

First, the Government offered evidence of Defendant's gambling primarily to show motive. Under 404(b), motive is clearly a proper purpose, and thus the first element is satisfied. Second, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence[.]" Fed.R.Evid. 401. The district court was well within the bounds of permissible choice in concluding evidence that Defendant gambled on the majority of the days stolen money orders were cashed made it more probable that Defendant's motive was to gamble with the money from the stolen checks.

Third, Defendant argues the gambling evidence's potential for "unfair prejudice" substantially outweighs its probative value because of the stigma attached to gambling. To support this contention, Defendant cites an article discussing the perils of gambling addictions. But the fact that some people are addicted to gambling does not establish a stigma attaches to gambling. Even if it does, the district court was again within the bounds of permissible choice to decide the evidence's probative value outweighed any prejudice. Furthermore, the court agreed to ask prospective

14

jurors about their gambling views so the court could exclude those who attached a stigma to gambling. Considering these facts, the district court did not make an "arbitrary, capricious, or whimsical" decision in holding the potential for prejudice did not outweigh its probative value. *See Mares*, 441 F.3d at 1156.

Fourth, the court gave the jury a limiting instruction. The court struck the part of the testimony that showed gains and losses and only allowed the jury to consider the evidence to the extent it showed the dates that someone using Defendant's player's card gambled. As this is "the proper purpose for which it was admitted," the fourth element is satisfied. In light of these four factors, the district court's admittance of Defendant's gambling evidence was not "arbitrary, capricious, or whimsical" and was "within the bounds of permissible choice." Therefore, the court did not abuse its discretion in admitting the gambling evidence.

D.

Fourth, Defendant argues excluding his statements made after his July 7 confession, in which he denied stealing and cashing the money orders, violated his Sixth Amendment right to present a defense. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). We review a district court's decision to exclude evidence for abuse of discretion. *United States v. Solomon*, 399 F.3d 1231, 1239–40 (10th Cir. 2005) (holding that, since the district court did not abuse its discretion in excluding certain evidence, the district court did not violate the defendant's right to present a defense). While Defendant certainly has a constitutional right to present a defense, this right does not exempt him from the rules of evidence. *Id.* Defendant does not challenge

15

the district court's ruling that his statements made after July 7 are hearsay. He instead argues, because the court admitted his confession, the court should have also admitted his subsequent hearsay statements pursuant to the rule of completeness or as rebuttal evidence.

The rule of completeness states: "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." Fed. R. Evid. 106. This is true even when the evidence the adverse party seeks to introduce is hearsay evidence. *United States v. Lopez-Medina*, 596 F.3d 716, 735–36 (10th Cir. 2010). One of the main purposes behind the rule of completeness is to prevent "the misleading impression created by takings matters out of context." Fed. R. Evid. 106 advisory committee's note. For that reason, "only those [statements, writings, or recordings] which are relevant to an issue in the case and necessary to clarify or explain the portion already received need to be admitted." *Lopez-Medina*, 596 F.3d at 735 (internal quotations omitted). Defendant faces a "high bar" to show the district court erred in excluding the evidence, as courts have "enormous discretion" in applying the rule of completeness. *United States v. Harry*, 816 F.3d 1268, 1280 (10th Cir. 2016). In determining whether Defendant's hearsay statements "in fairness ought to be considered," this Court considers whether those statements: (1) explain Defendant's confession; (2) place Defendant's confession in context; (3) avoid misleading the jury; and (4)

ensure a fair and impartial understanding of Defendant's confession. *Lopez-Medina*, 596 F.3d at 735.

None of these factors weigh in favor of Defendant. Defendant's self-interested statements made after consulting with a union representative and reflecting on the consequences of his prior confession do not explain or place Defendant's July 7 statement—a complete document—in context. That is, one does not understand more about the July 7 statement after reading Defendant's subsequent written statement. Defendant argues his subsequent disavowals must be admitted to avoid misleading the jury into thinking Defendant "had simply confessed, without further ado, to stealing the money orders." In the broad sense Defendant uses the term "mislead," a court misleads a jury anytime it excludes evidence. But the "misleading" that Rule 106 is concerned with is the "misleading impression created by taking matters out of context." Defendant's statement in itself is simply not misleading because no further context is necessary to have an appropriate impression of the statement. Next, Defendant argues the jury did not have a fair and impartial understanding of Defendant's confession because they did not hear he repudiated the confession either that night or the next day and denied committing the crimes every other time after that. Again, this argument fails because, as the Government did not take anything out of context in introducing the confession, the jury did indeed have an impartial understanding of Defendant's confession. The district court appropriately held the subsequent statements were hearsay that did not "in fairness" need be considered.

Defendant also argues his otherwise inadmissible hearsay may be admitted as rebuttal evidence. Essentially, he argues evidentiary rules against hearsay do not apply to rebuttal evidence. To support this argument, he cites two inapposite Supreme Court cases in which the Court admitted hearsay evidence that "bore persuasive assurances of trustworthiness." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *Green v. Georgia*, 442 U.S. 95, 97 (1979) ("The excluded testimony was highly relevant . . . and substantial reasons existed to assume its reliability."). We decline to fashion from this precedent a rule that hearsay may automatically be admitted if it rebuts the opposing party's case. Such a rule would eviscerate the rule against inadmissible hearsay, allowing many out-of-court statements with no assurances of reliability to be presented to the jury. Defendant's position is completely at variance with the primary purpose of excluding hearsay, which is "the lack of any opportunity for the adversary to cross-examine the absent declarant whose out-of-court statement is introduced into evidence." *Anderson v. United States*, 417 U.S. 211, 220 (1974). Because neither the rule of completeness nor precedent concerning rebuttal evidence required the district court to admit the hearsay statements, the court did not abuse its discretion in excluding them. Thus, the court did not violate Defendant's Sixth Amendment right to present a defense.

E.

Lastly, Defendant argues the court violated his Sixth Amendment guarantee of "a meaningful opportunity to present a complete defense" by instructing the jury that the Government was under no obligation to use any particular investigative method.

18

This instruction, he argues, "placed a thumb on the prosecution's side of the scale and prevented the jury from giving full consideration to his defense." This Court reviews a district court's decision to give a particular jury instruction for abuse of discretion and will only reverse if "there is substantial doubt that the jury was fairly guided." *United States v. Cota-Meza*, 367 F.3d 1218, 1223 (10th Cir. 2004). The Tenth Circuit has held a district court does not abuse its discretion in giving an investigative-techniques instruction when (1) the instruction accurately states the law; (2) the instruction "does not prevent the jury from concluding that a failure to employ certain investigative methods nevertheless detracts from the credibility of the government's evidence"; and (3) other jury instructions inform the jury it is the sole judge of credibility of the witnesses and weight of the evidence. *Id.*

In this case, all three conditions are present. As "there is no legal requirement that law enforcement officers utilize every available investigative method," the instruction accurately states the law. *See id.* Additionally, Defendant still presented ample evidence about the inadequacy of the Government's investigation, and the jury was still free to use that evidence to question the Government's credibility. Furthermore, the court instructed the jury elsewhere that it was "the sole judge[] of the credibility or 'believability' of each witness and the weight to be given to the witness's testimony." Therefore, the district court "fairly guided" the jury in giving the instruction and, thus, did not abuse its discretion in allowing the jury instruction. *See Cota-Meza*, 367 F.3d at 1223; *United States v. Johnson*, 479 F. App'x 811, 817–

19

18 (10th Cir. 2011) (unpublished) (holding the district court did not abuse its discretion in giving the exact same jury instruction).

The district court's judgment is AFFIRMED.

Entered for the Court

Bobby R. Baldock
Circuit Judge